LEWIS L. COLASURDO and MADELINE R. COLASURDO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Colasurdo v. Commissioner
Docket No. 5722-71.
United States Tax Court
T.C. Memo 1975-274; 1975 Tax Ct. Memo LEXIS 98; 34 T.C.M. (CCH) 1181; T.C.M. (RIA) 750274; September 2, 1975, Filed Martin Tucker and Jerome I. Gellman, for the petitioners. William M. Gross and Paul Sude, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: In his notice of deficiency, the respondent determined that *99 there were deficiencies and penalties due from the petitioners [1] in the amounts noted: Taxable Year
Deficiency
Negligence Penalty
1965
$ 8,338.26
$ 416.91
1966
140,146.09
7,007.81
1967
68,993.29
3,449.66
1968
31,437.65
1,571.88
1969
96,664.33
4,833.22
Respondent has conceded the principal issue raised in the statutory notice for the taxable years 1965 and 1966 and has claimed an increased deficiency in tax and penalty for the taxable year 1965 in the amounts of $ 2,442,680 and $ 123,134, respectively. As a result of concessions by the parties, the remaining issues for decision relate to the questions of (1) whether petitioners realized income in the taxable year 1965 on account of the purported sale by Pakco of a certain blueberry plantation through a series of transactions planned and consummated by petitioners and (2) whether petitioners are taxable on account of income of P. K. Hickey & Co., a partnership, allocated to the petitioner in the partnership return filed for the taxable *100 year 1969. The petitioners have not presented any evidence to refute the additions to the tax on account of negligence under section 6653(a). [2] For that reason, the additions to the tax shall apply to any deficiencies due from petitioner. FINDINGS OF FACT Some of the facts have been stipulated. Such stipulations and the exhibits attached thereto are incorporated herein by this reference. Lewis L. Colasurdo (hereinafter "petitioner") and Madeline R. Colasurdo are husband and wife whose residence at the time the petition was filed was Hammonton, New Jersey. Pakco Companies, Inc. (hereinafter "Pakco") is a corporation organized under the laws of the State of New Jersey. Petitioner owned 22 percent of the outstanding common stock of Pakco and his brothers, Girard Colasurdo and Anthony Colasurdo, together owned approximately 20 percent of said stock. The remaining stock was owned by approximately 1,000 stockholders. The stock of Pakco was traded over-the-counter. Petitioner had control of Pakco as the term "control" is defined in the Securities and Exchange Act *101 of 1934. Petitioner was president, chief executive officer, and a director of Pakco. Alexander N. Bronsen was vice-president of Pakco. Everett A. Whorl was controller of Pakco. The petitioner's two brothers were likewise directors of Pakco. The remaining directors were John Reilly, John Becher, and Lewis M. Evans. None of them was related to the petitioner. Crescent Corporation (hereinafter "Crescent") was a publicly held corporation organized under the laws of the State of Delaware. Its common and preferred stock was listed on the New York Stock Exchange. Walter Floersheimer and his son, Stephen Floersheimer, were directors of Crescent. Both were also partners in Sutro Bros. & Co., a registered broker-dealer and member of the New York Stock Exchange. Late in 1964, the petitioner entered into negotiations with Walter Floersheimer, representing himself and certain other sellers, for the acquisition of a controlling block of the common stock of Crescent. About the same time, the petitioner also learned of another large block of Crescent stock held by a Dr. Mencher which could be purchased. In the course of these negotiations, petitioner contacted William F. Kelly, president *102 of First Pennsylvania Bank and Trust Company (hereinafter "First Pennsylvania"). First Pennsylvania was the bank at which Pakco did its business and from which Pakco and petitioner had borrowed funds. However, First Pennsylvania was not able to lend any additional funds to Pakco since Pakco was already indebted to the bank in excess of 12 million dollars. Mr. Kelly suggested that the loan which petitioner would require, if the Crescent stock was to be purchased, be made to the petitioner and his wife individually. Similar transactions had been consummated in the past for the benefit of Pakco. Petitioner thereupon evolved, with the assistance of Whorl, a plan whereby a blueberry plantation owned by Pakco might be sold to Crescent in order to raise the funds with which to buy the controlling stock of Crescent. Preliminary thereto, it was planned that the petitioner would first borrow individually the required downpayment on the Crescent stock from First Pennsylvania. During the course of the negotiations, an elaborate plan was evolved by petitioner and Whorl to consummate the purchase of the 436,400 shares of common stock of Crescent from the Floersheimer group. A plan was also evolved *103 for the purchase separately of the Crescent stock held by Dr. Mencher. Pursuant to the plan, the petitioner caused to be organized the following: (1) Caletta Blueberry Co., Inc. (hereinafter "Caletta"), organized under the laws of the State of New Jersey, to serve as a conduit in order to conceal the involvement of petitioner in the purchase and sale of the assets of Pakco. (2) ALCA Industries Corporation (hereinafter "ALCA"), a corporation organized to acquire and hold the Crescent stock purchased from the Floersheimer group. (3) BLCB, Industries Corporation (hereinafter "BLCB"), a corporation organized to acquire and hold the Crescent stock purchased from Dr. Mencher. (4) Delaware & N.J. Properties, Inc. (hereinafter "DNJP"), a corporation originally organized by Bronsen and utilized as a part of the plan to conceal the transfers of certain funds in payment of the loan at First Pennsylvania. (5) Makepeace Inc. (hereinafter "Makepeace"), a corporation organized under the laws of the State of Delaware further to conceal the transfer of the funds to be received from the sale of the blueberry plantation. On May 19, 1965, the board of directors of Pakco authorized the sale *104 of a blueberry plantation it owned consisting of approximately 2,500 acres of land and various buildings thereon, to a non-existing person, Charles E. Meyers, or his nominee, for $ 3,850,000 of which $ 500,000 was to be paid in cash on December 1, 1965, and the balance of $ 3,350,000 in the form of an unsecured promissory note payable in five annual installments of $ 670,000 with interest at 5-1/2 percent. The first installment of principal and interest was not due for five years. Pakco's basis in the plantation, for the purpose of computing gain, was $ 150,207. As a result of the negotiations with the Floersheimer group, on or about June 18, 1965, ALCA purchased the 436,400 shares of Crescent stock for $ 6,546,000 or $ 15 per share, on which $ 5 was payable at the closing and the balance was represented by one share of non-voting $ 5 par value convertible preferred stock, series A, and one share of non-voting $ 5 par value convertible preferred stock, series B, of ALCA. The agreement provided that the preferred shares would be redeemed in two annual installments at which time a stated number of shares of the Crescent stock would be released from escrow. The 436,400 shares of Crescent *105 stock were duly placed in escrow with First Pennsylvania pursuant to an escrow agreement whereby upon the redemption of all of the series A preferred stock for $ 2,182,000, in June 1966, 40 percent of the Crescent stock would be released from escrow, and upon the redemption of all of the series B preferred stock for $ 2,182,000, in June of 1967, the balance of the stock would be released from escrow. The escrow agreement further provided that ALCA had the right to full and unrestricted beneficial ownership including the right to vote the shares during the escrow period. Before the escrow was consummated, the petitioner arranged for the 436,400 shares of Crescent stock to be held as collateral by First Pennsylvania on account of a temporary loan of $ 1,963,800 made to ALCA, which with an additional $ 218,200 obtained from Pakco by way of an unsecured loan to Bronsen, made up the initial payment of $ 2,182,000 required for the purchase of the stock from the Floersheimer group. Petitioner personally guaranteed the loan to ALCA. On June 10, 1965, petitioner, Bronsen, and Whorl resigned their respective positions with Pakco. On June 29, 1965, petitioner became president of Crescent, *106 Bronsen became a vice-president of Crescent, and Whorl became treasurer of Crescent. All three, and another nominee of the petitioner, were elected to four of the seven seats on the board of directors of Crescent. On August 9, 1965, Pakco deeded the plantation to Caletta for a stated consideration of $ 3,850,000, of which $ 500,000 was payable on closing and the balance of $ 3,350,000 was deferred for a period of five years, when it became payable in annual installments. On August 31, 1965, Caletta sold the plantation to Makepeace for a stated sales price of $ 3,900,000, of which $ 500,000 was payable on November 30, 1965. The balance was represented by an unsecured installment note for $ 3,400,000. The first installment was not due for five years. On September 25, 1965, Makepeace sold the plantation to Crescent Properties, a newly organized subsidiary of Crescent to acquire the blueberry plantation, for a stated price of $ 4,000,000. The consideration paid on that date was $ 600,000 cash, 125,000 Crescent shares with a market value of $ 1,500,000 and an unsecured installment note for $ 1,900,000 payable in annual installments beginning four years later. Actually, it was part *107 of the plan to pay the note in full immediately to provide petitioner with the funds he needed to pay the temporary loan at First Pennsylvania. On October 1, 1965, Crescent Properties prepaid the $ 1,900,000 note in full. These funds when added to the $ 600,000 paid at closing provided Makepeace with $ 2,500,000 in cash. On October 11, 1965, Makepeace issued a check for $ 2,000,000 to Guarantee Bank which wire-transferred the funds on the same date to the Irving Trust Company, New York, New York, for credit to the account of DNJP. On the same date, Irving Trust transferred $ 1,998,302.91 from the DNJP account to First Pennsylvania which applied the funds in full payment of principal and interest due on the temporary loan. In October and November of 1965, Makepeace disbursed a total of $ 500,000 to Caletta which in turn paid the same amount to Pakco. At December 31, 1965, all of Makepeace's $ 2,500,000 had been disbursed. It retained the 125,000 shares of Crescent. Subsequently, in December 1965, Pakco sold Telectron and HIMCO, two operating divisions of Pakco to Crescent in exchange for 600,000 shares of Crescent stock. During the year 1966, the Securities and Exchange Commission *108 initiated an inquiry with respect to Crescent. Petitioner and his associates thereupon became concerned that such inquiry would lead to the discovery of the manner pursuant to which petitioner had acquired control of Crescent. The parties thereupon embarked upon a plan to falsify the records in order to conceal such transactions and ultimately to repay or make restitution to Pakco for the funds owing on account of the sale of the blueberry plantation and the unsecured loans to Bronsen. As a result of the investigation by the Securities and Exchange Commission, petitioner and Whorl, among others, were convicted on February 10, 1971, of a conspiracy to defraud the Securities and Exchange Commission and of filing false reports with the Commission and with the New York Stock Exchange. Petitioner's conviction was affirmed on appeal by the United States Court of Appeals for the Second Circuit and he was sentenced to a term of imprisonment of two years. In an amendment to his answer, the respondent has asserted that the petitioner realized income in the amount of $ 3,500,000 in the taxable year 1965 in the form of either an embezzlement by petitioner of the value of the blueberry plantation *109 or the funds to be received from the sale thereof, or, in the alternative, as a preferential dividend resulting from such sale. The respondent has the burden of proof with respect to that determination. During the taxable year 1969, the petitioner was a limited partner in the firm of P. K. Hickey & Co. Paul K. Hickey and Thomas J. Hickey, Jr., were the general partners. The firm was a member of the American Stock Exchange, conducted a general brokerage business, bought and sold securities for its own account and engaged in other business activities relating thereto. As amended May 25, 1964, the partnership agreement of P. K. Hickey & Co., provided that the net profit of the partnership shall be distributed as follows: Paul K. Hickey
45 percent
Thomas J. Hickey, Jr.
15 percent
Lewis Colasurdo
40 percent
The net profits for the purposes thereof were to be determined with respect to general accounting principles, after deducting the expenses of the business, including the compensation to be paid to the general partners. As a result of the proceedings against the petitioner by the Securities and Exchange Commission, Paul K. Hickey requested the petitioner early *110 in the year 1969 to withdraw from the partnership. Negotiations thereupon ensued between Mr. Hickey and the petitioner for a period of some months. Such negotiations ultimately resulted in an agreement entered into December 12, 1969, which provided in part that the retiring partner, the petitioner, would be relieved of all of his partnership obligations as of the close of business on November 30, 1969. Paragraph 5 of the agreement further provided as follows: 5. Consideration. In full payment for his interest in and share of the limited partnership, the Continuing Partners shall (in addition to the transfer to the Retiring Partner of the personal property described in the preceding paragraph) pay to the Retiring Partner the sum of $ 152,500.00, in the following installments: (a) $ 70,000.00 on January 8, 1970 at 4:00 p.m. at the aforementioned office of Lawson F. Bernstein; and (b) $ 82,500.00 in two installments, the first of $ 41,250.00 to be due and payable on July 1, 1970, and the second of $ 41,250.00 to be due and payable on December 30, 1970, together with interest on each installment from the date of this agreement at the rate of 6% per annum on the unpaid balance. *111 The aforesaid two installment payments shall be evidenced by the delivery by the Continuing Partners to the Retiring Partner simultaneously herewith of two serial negotiable promissory notes made by the Continuing Partners, endorsed by Jean M. Hickey, Paul H. Hickey's wife, and containing the usual acceleration of payment provisions in the event of a default in payment of an installment and the continuance thereof for five (5) days, such notes to bear interest at the rate of 6% per annum. The Continuing Partners shall have the right to prepay both or either of said notes without penalty. For the taxable year ended December 31, 1969, the income of the partnership, as shown by the partnership return filed for that year amounted to $ 11,257.90. Pursuant to said return, the distributive shares of the partners (after deducting partners' salaries) were reported, as follows: Paul K. Hickey
Loss
[69,673.71)
Thomas Hickey, Jr.
Loss
(23,224.57)
Lewis L. Colasurdo
Profit
104,156.25
Total
$ 11,257.97
The parties have stipulated that the income of the partnership as of November 30, 1969, was the same as the income of the partnership as reported for the taxable *112 year ended December 31, 1969. As of November 30, 1969, petitioner's capital account with the partnership amounted to $ 48,000 being the amount remaining after the withdrawal of some $ 169,000 in June 1969. Respondent has determined that the sum of $ 104,156.25 of the $ 152,500 paid to the petitioner on account of his interest in and share of the limited partnership constituted a distribution to the petitioner of the income of the partnership earned prior to November 30, 1969. OPINION With respect to the transactions relating to the sale by Pakco of the blueberry plantation, the respondent has determined that the petitioner either embezzled or received a preferential dividend resulting in the receipt of income by petitioner in the amount of $ 3,500,000 in the year 1965. On either theory, it is incumbent upon the respondent to prove that the petitioner received for his own use properties or moneys belonging to Pakco amounting to $ 3,500,000. The respondent has failed to meet that burden. The respondent's determination relates to the taxable year 1965. In considering whether the petitioner realized income of $ 3,500,000 in that year as a result of the transactions relating to *113 the sale of the blueberry plantation, the Court is not concerned with what happened during the taxable years 1966 and 1967 as a result of the attempt by petitioner and others to conceal the facts from the Securities and Exchange Commission. Nor are we concerned with whether there was a restitution on account of which, assuming the petitioner was found to have embezzled funds, there resulted an offsetting deduction. The petitioner contends that it was his intention at all times to bring about a merger between Crescent and Pakco and that the plan which he embarked upon in 1965 was designed to achieve that result. He further stated that the board of directors of Pakco was cognizant of that plan. Respondent would have the Court reject such testimony on the grounds that no weight should be accorded to the petitioner by reason of his prior conviction. In addition, respondent points to the fact that the petitioner caused Pakco to sell its operating divisions to Crescent, thereby evidencing an intent to liquidate Pakco. To substantiate his contention that petitioner never intended to repay the debt to Pakco on account of the sale of the blueberry plantation, respondent called Whorl as *114 a witness who testified that petitioner planned to avoid repayment by first depreciating the value of the stock of Pakco, buying up that stock, and then liquidating Pakco, thereby acquiring the debt. If this was in fact the petitioner's plan, it would hardly result in an embezzlement or taking of property by petitioner either in 1965 or at any other time. Any income resulting from such a plan would be taxable when and if the plan was consummated. Regardless whether the testimony of the petitioner in this case should be rejected as having no probative value on account of his prior conviction, the respondent has the burden of proof. The respondent cannot affirmatively prove the opposite merely by calling the petitioner a liar. The respondent had Lewis M. Evans, a director of Pakco, under subpoena at the time of this case. The respondent elected not to present the testimony of Evans from which the Court would infer that his testimony would corroborate that of petitioner. Furthermore, the alleged inconsistency cited by the respondent to discredit petitioner's testimony -- the sale of the operating divisions of Pakco to Crescent in exchange for its stock -- would be wholly consistent *115 with petitioner's testimony that his intent from the outset was to acquire control of Crescent and bring about a merger of the two corporations. The blueberry plantation likewise ended up with Crescent. Whatever the petitioner's motives, however, the plan or conspiracy had not been fully consummated at December 31, 1965. It was in "midstream" when the Securities and Exchange Commission commenced its investigation. No benefit had accrued to the petitioner personally as of December 31, 1965, and there is no basis for determining whether petitioner did not, in fact, at all times intend to bring about a merger which would be advantageous to the stockholders of Pakco. In brief, as of December 31, 1965, Pakco had "sold" the blueberry plantation to Caletta for a stated price of $ 3,850,000 on account of which Pakco had received $ 500,000 and held Caletta's note for $ 3,350,000. Caletta had in turn "sold" the blueberry plantation to Makepeace for a stated price of $ 3,900,000 on account of which Caletta had received $ 500,000 and held Makepeace's note in the amount of $ 3,400,000. Makepeace, in turn, had "sold" the blueberry plantation to Crescent Properties, a newly organized subsidiary *116 of Crescent for a stated price of $ 4,000,000 on account of which Makepeace had received $ 600,000 in cash, 125,000 shares of Crescent stock valued at $ 1,500,000 and Crescent Properties' note for $ 1,900,000. Crescent Properties promptly paid the note, providing Makepeace with $ 2,500,000 of which $ 500,000 was paid to Caletta and by it to Pakco. The remaining $ 2,000,000 was used to pay the temporary loan at First Pennsylvania. If the petitioner had not resorted to the various steps designed to conceal the fact that he was really dealing with himself, there could be no claim of embezzlement or constructive dividend. The petitioner had financial resources. He had engaged in similar transactions in the past. William F. Kelly, president of First Pennsylvania, obviously had a high regard for the petitioner as a long-time customer of the bank. While it is clear that petitioner deliberately violated the rules of the Securities and Exchange Commission and the New York Stock Exchange, and was willing to falsify records and perjure himself in an effort to conceal such violation, the Court is unable to find that when petitioner embarked upon these transactions it was his intent to appropriate *117 for his own use property or funds of Pakco in the amount of $ 3,500,000. Rather, it would be more reasonable to assume that petitioner intended to use the funds, as an unsecured loan, to acquire control of Crescent. In substance, the petitioner bought the blueberry plantation from the corporation which he controlled for $ 3,850,000, of which $ 3,350,000 was deferred in order that he might resell the plantation to Crescent Properties, another corporation which he controlled, to raise the cash required to finance control of Crescent. There is nothing in this record from which the Court can find that petitioner did not intend to pay Pakco the balance owing on account of its sale of the blueberry plantation. [3]
This conclusion was summarized succinctly by Judge Lumbard, *118 in his concurring opinion, affirming the conviction of the petitioner in the case of , wherein he said: The entire scheme was an attempt by Colasurdo to conceal from the stockholders and creditors the sham nature of the sales of the blueberry patch that allowed him, in effect to borrow from Crescent $ 2,000,000 for five years with which he purchased his controlling interest in Crescent. * * * Whether, once the conspiracy was enlarged to encompass the coverup or concealment of the self-dealing from the Securities and Exchange Commission, the petitioner may actually have ended up appropriating funds of Pakco, we need not decide. The "coverup" occurred subsequent to the taxable year 1965. Likewise, since the Court has not found that petitioner embezzled any funds, it is also unnecessary to determine whether what transpired in 1967 or later constituted restitution of embezzled funds. Accordingly, it is the opinion of the Court that respondent has failed to prove that petitioner either embezzled or received income in the form of a preferential dividend, or otherwise, in the amount of $ 3,500,000 in the taxable *119 year 1965. The respondent contends that, notwithstanding the agreement providing for the sale of petitioner's interest in P. K. Hickey & Co., a partnership, the amount received by the petitioner represented in part a distribution of the income earned by the partnership up to May 31, 1969. Accordingly, the respondent would charge the petitioner with the sum of $ 104,156.25 which was allocated to him in the partnership return for the taxable year 1969, notwithstanding that the income of the partnership for that year amounted to only $ 11,257.97. The respondent thus seeks to avoid the provisions of the partnership agreement, as well as the agreement entered into for the sale of petitioner's interest therein, upon the basis of the testimony of P. K. Hickey that petitioner was really being paid for his share of the income up to May 31. Section 702(a) requires that a partner take into account his distributive share of the partnership income. Section 704(a) provides that such share shall be determined, except as otherwise provided, by the partnership agreement. Section 761(c) provides that the partnership agreement shall include any amendments or modifications thereof "which are agreed *120 to by all the partners" up to the time prescribed by law for the filing of the partnership return. The respondent's position thus is directly contrary to the rules prescribed by statute. In this case, the partnership agreement provided for the distribution or allocation of the partnership income among the partners. The agreement entered into on December 12, 1969, whereby petitioner withdrew from P. K. Hickey & Co., did not modify the provision for such distribution. It merely provided for a sum to be paid for petitioner's interest in the partnership. We must recognize that the respondent has the right to go behind a written agreement, and look to the economic realities of a transaction. , vacating and remanding , certiorari denied . However, the only basis offered by the respondent for disregarding the agreement in this case was the inconclusive testimony of P. K. Hickey. We do not regard this as sufficient to set aside an agreement as arrived at by the parties as a result of hard bargaining. The written agreements entered into by the parties after *121 extensive negotiations are controlling. See , aff'g. . Decision will be entered under Rule 155.
Footnotes
1. Madeline R. Colasurdo is a party to this action solely by virtue of having filed a joint income tax return with her husband for the years in question.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. The respondent seeks to account for the delay in his determination that petitioner appropriated or received $ 3,500,000 in 1965 on the grounds that the records were not available to the respondent at an earlier date. However, the facts are clearly set forth in a proceeding before the Securities and Exchange Commission involving the reports of Crescent Corporation dated January 5, 1967, and received as Exhibit BT.↩